Paul King
Plaintiff, Pro-Se
801 S. Miami Ave #1401
Miami, Fl 33130
pablopicassojustice@gmail.com
571-623-2876



## SOUTHERN DISTRICT COURT OF FLORIDA

**PAUL KING**, an individual,
Plaintiff,

vs.

**BANKERS AND INVESTMENT BANKS:**
CANACCORD GENUITY, a corporation;
HAYWOOD SECURITIES, a corporation;
GRAHAM SAUNDERS, an individual;
SPIRO KLETAS, an individual;
DARREN CARRIGAN, an individual;
AND

**INDIVIDUALS**:
DIMITRY ROMANTSOV;
ROMAN TEMKIN;
SOPHIA KING;
MICHAEL KING;
AND

**LAW FIRMS**
DISANTO LAW FIRM, a corporation
RINGGENBURG LAW FIRM, a corporation
DUMOULIN BLACK, a corporation
DORSEY & WHITNEY, a corporation
AND

**CORPORATIONS:**
BIG HUGS HOLDINGS, a Canadian Corporation;
CANNAFORNIA HOLDINGS CA, a Canadian Corporation;
CANNAFORNIA HOLDINGS, a US Corporation

## COMPLAINT AND REQUEST FOR INJUNCTION

Count 1: Securities Fraud: 18 U.S. Code § 1348: Selling Cannafornia and Plaintiffs shares by forgery and deception

Count 2: Racketeering: 18 U.S. Code § 96. Devising a plan that relies on fraud by lawyers and law firms, bankers and investment banks, and many individuals to orchestrate the fraud and then cover it up.

### I. JURISDICTION

1. Plaintiff is and was at all times of these allegations a resident of Miami, Florida.

2. Defendants are spread out from Florida to California to various parts of Canada, and therefore choosing the venue where Plaintiff has resided while causes of action took place is most appropriate.

### II. CLAIMS AND PRAYER FOR INJUNCTIVE RELIEF

#### A. CLAIMS:

1. Plaintiff was Founder and CEO of Cannafornia, a Greenhouse Cannabis company in California. Cannafornia's holding company was initially Cannafornia Holdings, a Delaware Corporation, and later merged into Cannafornia Holdings CA, a Canadian Corporation and Big Hugs Holdings, a Canadian Corporation.

2. Plaintiff was introduced to Spiro Kletas ("Kletas"), a Canadian investment advisor by Roman Temkin ("Temkin"), an early investor in Cannafornia, at a cannabis trade show in Las Vegas in December 2018.

3. Kletas claimed to be interested in helping Plaintiff raise money for Cannafornia and to help take it public.

4. Kletas invited Plaintiff to Canada and arranged meetings with investment banks and bankers in Vancouver and Toronto to raise money for Cannafornia to expand and prepare to go public.

5. Plaintiff and Kletas had approximately 25 meetings, and 24/25 were interested in investing. They all loved the name Cannafornia and made remarks that it was a great name to take public.

6. A total of $9.6M was raised for the Company.

7. Darren Carrigan ("Carrigan") was one of the early investors and joined Plaintiff on the Board.

8. Canadian investors had invested in the $.50 round, and approximately 60 days later European investors were introduced through Kletas and invested in the $1 round.

9. Kletas explained that this was how these types of financings are done, because the bankers are the ones that are going to make the big push for the company to go public.

10. After the $9.6M was invested, Plaintiff was to retain 33.3% of the Company's shares, down from 50% which Plaintiff owned prior to the raise.

11. Temkin and his Russian group were to own 33.3% and the new investors that had invested the $9.6M were to own 33.3%.

12. These transactions occurred through three fundraising rounds in 2019, with the last small round raised at $1.50 per share around November 2019.

13. On September 23, 2021, The Bureau of Cannabis Control copied Plaintiff as the named license holder in an email reply to attorney Kieran Ringgenburg's request to change the name on the license from Paul King to another individual. The request was denied by the BCC, informing Ringgenburg that he needs Plaintiffs permission.

14. Plaintiff started looking through thousands of emails to understand on what grounds the investors were trying to wrestle control from Plaintiff.

15. Plaintiff uncovered that between July and August 2019, Cannafornia was actually sold, including Plaintiffs 50% of the company, by forging Plaintiff's signature.

16. Plaintiff remained CEO, clueless to the sale.

17. Plaintiff never received any funds from the sale of the company and instead was attacked from all angles from the time the company was sold in a concerted effort to pile legal problems onto Plaintiff as Defendants carry out their plan.

18. Had it not been for the pandemic which halted evictions, the plan likely would have worked, where Plaintiff would be blamed for mismanagement of funds and not have enough time to uncover what actually occurred.

## B. PRAYER FOR INJUNCTIVE RELIEF

1. Funds equal to the purchase and sale price of Plaintiffs shares, believed to be $4.8M, to be frozen and held at the Direction of the Court.

2. For the Corporations holding entities, Big Hugs Holdings, Cannafornia Holdings CA, and Cannafornia Holdings (Delaware) to be prevented from financing rounds and/or go-public transactions until the Court makes a ruling.

3. Plaintiff has suffered tremendous distress from the premeditated attack, and most alarming is that their plan would have worked if not for a once in a century pandemic coming at exactly the right time. To prevent these powerful individuals and institutions from considering such a plan again, and to set an example of the consequences of greed and evil, punitive damages should be weighed accordingly.

## III: EVIDENCE OF CLAIMS

1. Plaintiff was told and believed that he was meeting with Canadian bankers in order to raise capital to fund and expand his cannabis company, Cannafornia. Plaintiff raised three rounds, the first at $.50 per share for approximately $3.6M CAD in June 2019, the second at $1 per share for approximately $9.1M CAD in July 2019, and the third for $1.50 per share in November 2019 for approximately $200,000 CAD in November 2019, all for class A shares as shown in **Exhibit 1**.

2. Canaccord Genuity, considered the top investment bank for cannabis, headquartered in Toronto, Canada, and other top banks including Haywood Securities had meetings with King and all seemed very interested in investing and taking the company public with King holding approximately 33% of the shares by the time the Company was public. The individual bankers, including Graham Saunders, dubbed "The Marijuana Money Man" by the Wall Street Journal (**Exhibit 2**) personally or through family members invested into the $.50 Round, as shown in Exhibit 1.

3. According to the Canadian defendants, Americans had to hold their shares in Class B shares and convert over to Class A shares once Cannafornia was public at a 66:1 ratio. Plaintiffs' 498,500 shares Class B shares (**Exhibit 3**) would therefore convert to approximately 30m of the outstanding 83m shares (**Exhibit 4**).

4. It was understood that new money raised after these rounds would add to the outstanding share count and dilute everyone accordingly.

5. This understanding is confirmed in many emails and texts, including recently in emails with Dorsey and Whitney ("DW") attorneys in **Exhibits 5 and 6** as well as with Dumoulin Black ("DB") attorney Justin Kates ("Kates") in **Exhibits 7 and 8**.

6. And including in March 2020 by Spiro Kletas ("Spiro") and DB attorneys during a private sale transaction with Ken Rubin ("Rubin") (**Exhibits 9-12**) buying shares from Plaintiffs' Class B Shares, including **Exhibit 11** where Spiro emails Rubin:

> "Your shares convert at 66/1. Your shares were transferred direct from Kannaking (look at the certificate). All of Kannakings shares were Class B that convert to Class A at that ratio."

7. Dimitry Romantov ("Dimitry") and Temkin were introduced to Plaintiff by his mother Sophia King ("S. King") as someone that wanted to invest approximately $20M into Cannafornia, someone that she inherently trusts and that owes her a favor because of S King nursing his wife back to health from a life threatening cancer.

8. Plaintiff recently learned that Dimitry is friends with Michael King ("M. King") and has a criminal history and is currently illegally in the United States after having been denied citizenship by the USCIS (**Exhibit 13**) for a number of fraud-related business ventures in Russia.

9. Dimitry in fact invested only a fraction of the $21M that his email records show were actually sent to him by Russian investors that were intended for the Company and never made it to Company bank accounts (**Exhibit 14**) and instead were either laundered or embezzled.

10. Dimitry hired Amy Maliza ("Maliza") of Disanto Law in early 2019.

11. Despite Dimitry not being on the Board or an executive of the Company, Maliza sends Dimitry at least 29 emails where she proceeds to set up Company structures, the sale of the Company, and wires to Dimitry's accounts as he requests without cc'ing Plaintiff, who Maliza knew to be the CEO of the Company **(EXHIBIT 31).**

13. An email from attorney Kieran Ringgenburg asks the Bureau of Cannabis Control to change the license owner name and the response, cc'ing Plaintiff, and the Bureau's response in **Exhibit 15,** followed by Plaintiffs response alleging fraud (**Exhibit 16**).

14. Plaintiff uncovered emails from August 14, 2019 where, through an obscure Form D with one vague sentence in the middle of the document regarding share conversion, the Company was sold for approximately $6.4M without the Founder and CEO's knowledge or consent (**Exhibits 17 and 18).**

15. Besides not agreeing to the sale and having his signature forged, Plaintiff never received anything for his shares (**Exhibit 19**).

16. On July 7th, while Plaintiff was away, Dimitry tells Dorsey Whitney attorneys to send documents directly to his email in order to have them signed by Plaintiff (**Exhibit 20**).

17. In order to get the money out of the company;
   a. Checks are written to Sophia King and dozens of employees (**Exhibit 21**), Plaintiffs' signature is forged on every check.

  b. On March 1st when Plaintiff suspected something was wrong and went to the farm to fire Dimitry and his family, S. King supported Plaintiff to his face and behind his back helped Dimitry close bank accounts in time, with an email on Feb 28th (**Exhibit 22**).

  c. Plaintiff asks S. King for bank statements and S. King replies there were no bank accounts (**Exhibit 23**)

18. Embezzlement through PG&E

  a. Typical PG&E bills on the farm are between $2,000 and $6,000 a month and there is only one meter.

  b. Suddenly bills start appearing for multiple meters for multiple accounts for hundreds of thousands of dollars, which Dimitry and S King set up and pay through Cannafornia accounts (**Exhibit 24**).

19. Embezzlement through Dama Financial

  a. In August 2019 Michael King ("M. King") introduced Plaintiff to Dama Financial as a cannabis banking solution. Plaintiff puts a safeguard in place that every wire goes to his email and he approves it (**Exhibit 25**).

  b. S. King manipulates Plaintiff to open a payroll account and then opens a second payroll account for no good reason (**Exhibit 26, Exhibit 27**) and gets money out so via A2A transactions which bypass the approvals specifically set up by Plaintiff to avoid theft.

  c. S. King misdirects, claiming Dama Financial statements are TD Bank statements (**Exhibit 28**)

  d. Plaintiff looks into the situation with Dama Financial and the Account Representative, Jason, seems nervous (**Exhibit 29**) asking who it is for, and then a few hours later lies

(**Exhibit 30**) in an attempt to cover it up since the company has no interest bearing accounts with the bank.

Respectfully,

PAUL KING

Paul King
801 S. Miami Ave
#1401
Miami, FL 33130